**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| KEITH D. BROWN | : | |
| | : | |
| v. | : | Civil No. CCB-06-2668 |
| | : | |
| CONOPCO, INC. | : | |
| | : | |

**MEMORANDUM**

Plaintiff Keith D. Brown ("Mr. Brown") was employed as a machine operator at the

Baltimore Foods factory operated by the defendant Conopco, Inc., d/b/a Unilever Bestfoods,

N.A. ("Unilever").   Unilever terminated Mr. Brown's employment in 2004, and Mr. Brown is

suing Unilever for allegedly violating the Family and Medical Leave Act ("FMLA").   Unilever

has moved for summary judgment.  The issue is fully briefed[1] and no hearing is necessary.  *See*

Local Rule 105.6.  For the reasons articulated below, Unilever's motion will be granted.

---

[1]Mr. Brown has filed two memoranda in opposition to the motion for summary judgment: a response, which was timely filed on July 20, 2007, and a Supplemental Memorandum, which was filed three days after his opposition was due.  Mr. Brown obviously foresaw the need to file an additional memorandum; he included a note in his original opposition filing that "Plaintiff will file a supplemental response in opposition that incorporates and supplements this argument."  (Pl's Opp'n Mot. at 18 n.14.)  For the purposes of this ruling, the procedural deficiency in this late filing will not be considered and the supplemental memorandum will be incorporated into the initial filing.

## *BACKGROUND*

The facts, viewed in the light most favorable to the plaintiff, follow.  Mr. Brown began working for Unilever in December 1997 as a forklift operator; he later became a machine operator.  Mr. Brown also was a union shop steward, a job he held concomitant with his other duties at the factory.  In approximately 2001 or 2002, Mr. Brown began requesting FMLA leave to accompany his foster mother, Marion Whiting ("Mrs. Whiting") to the doctor.  Mrs. Whiting had been diagnosed with dementia; her short-term memory was unreliable and the doctors had advised that another adult be present at doctor visits.  In accordance with Unilever's leave policy, Mr. Brown submitted a medical certification in 2003 to support his request for intermittent Family/Medical leave.  That form indicated that Mrs. Whiting had a "Chronic Condition[] Requiring Treatment," and that she required assistance with "medical, personal, safety, or transportation needs."  Mr. Brown submitted a recertification in 2004.  As Mrs. Whiting's health deteriorated, Mr. Brown began providing more care for her; according to Mr. Brown, there were "times when [he] would do the food, the care, medicine, and sometimes . . . I just had to be there with her because, you know, she just really couldn't do anything at all." (Def's Mot. Summ. J. Ex. A. at 50-51.)

The events leading up to Mr. Brown's termination took place in October 2004.  On October 6, Mr. Brown received a call at work from Mrs. Whiting's apartment complex, telling him that her apartment had flooded.  Before leaving work, Mr. Brown submitted a form requesting that the time off be treated as FMLA leave.  Mr. Brown described Mrs. Whiting's condition that day as upset, and said that "the best [he] could do [was] provide some comfort and calm mom down and get her out of the apartment."  (Def's Mot. Summ. J. Ex. A at 73.)

2

Two days later, on October 8, Mr. Brown left work again, after receiving a phone message regarding Mrs. Whiting's apartment.  Mr. Brown was told that insurance people were coming in to look at his mother's apartment.   Again, Mr. Brown submitted a form requesting that his time off be treated as FMLA leave before leaving work.   When he arrived at the apartment, however, he discovered workers from the apartment complex, not insurance adjusters.  The crew needed Mrs. Whiting to be out of the apartment so that they could lift up the carpet and dry it out; Mr. Brown took his mother to get something to eat and did not return to work that day.

On October 11, 2004, Mr. Brown was called into a meeting with Timothy Manvilla ("Mr. Manvilla"), his boss, and Marian Perry ("Ms. Perry"), another union shop steward.  At that meeting, Mr. Manvilla asked Mr. Brown to provide documentation in support of his absences on October 6th and 8th; the deadline given was October 18, one week later.  Mr. Brown agreed to attempt to provide the information.  The October 18th deadline came and went without Mr. Brown's having provided any documentation from the apartment complex.  Mr. Brown states that he "tried to talk to the head of the apartment complex" and that he "could not get it."  (Def's Mot. Summ. J. Ex. A at 93-94.)  Mr. Brown also testified, in his deposition, that he attempted to communicate to Mr. Manvilla on the 18th that he was not able to obtain the documentation, but Mr. Manvilla was not at work that day; he testified that he relayed a similar message, however, to Marian Perry, the shop steward.  Mr. Brown did approach Mr. Manvilla on the 21st and told him that he would get him the information as soon as possible.

Mr. Brown had provided advance notice of a planned absence on October 22nd, a day on which he needed to take his mother to a therapy appointment.  At this point, he had yet to provide documentation for his absences on the 6th and the 8th.  According to Mr. Manvilla, the

failure to provide documentation raised Unilever's suspicions about Mr. Brown's use of FMLA leave. It may also be true that Unilever was predisposed to be suspicious about Mr. Brown; in his deposition, Mr. Manvilla stated that Mr. Brown was "the only person that on a consistent basis refused to provide documentation." (Def's Mot. Summ. J. Ex. B at 44.) Unilever hired Comprehensive Investigations, Inc., to conduct surveillance of Mr. Brown on October 22nd. Comprehensive arrived at Mrs. Whiting's home at 6:50 AM. After confirming that Mrs. Whiting was inside, the investigator remained at her apartment until 2:30PM; Mrs. Whiting did not leave. The investigator also attempted to stake out Mr. Brown's residence; that failed, however, because Mr. Brown had just purchased a new home and had spent the night there.

Mr. Brown testified that he waited at his new residence for his sister to bring his mother to visit. When she arrived, Mrs. Whiting became upset because she realized that she would not be able to live in Mr. Brown's home. She was so upset that Mr. Brown called Pam Del Nero, Mrs. Brown's therapist, and cancelled Mrs. Brown's appointment. Mr. Brown testified that he then took his mother to lunch, to buy hair supplies, and to a dollar store. He returned his mother to her apartment that afternoon and then picked up his foster son from school.

On October 25th, Mr. Manvilla requested a meeting with Mr. Brown; also present were several other officials from the company. Mr. Brown was again asked about the documentation for the 6th and the 8th, and given a new deadline - October 29th - for providing information regarding his whereabouts on those days. He also was asked about his activities on October 22nd. Mr. Brown testified that he told the meeting participants he was having some difficulties getting the October 6th and 8th documentation and that "it was pretty much out of [his] control and [he] had to wait for the management office to actually send it." (Def's Mot. Opp'n Summ. J.

Ex. A at 99.)   Mr. Brown also told them that his mother's appointment on the 22nd had been

cancelled because she was "upset." It is unclear whether Mr. Brown was explicitly told at this

point that he would be suspended if he did not comply with the deadline.

The following day, Mr. Brown met with Mike Johnston, the production manager at

Unilever, and Ms. Perry.  Mr. Brown explained to Mr. Johnston that he was having some

difficulty getting the information from the Village Oaks apartment.  At that meeting, Mr.

Johnston explained to Mr. Brown that he would be suspended if he did not produce the

documentation.

Two days later, on October 28th, Mr. Brown submitted a brief note on Village Oaks

Apartments stationery.  In the note, Assistant Community Manager Tyra Gillard explained that

Mr. Brown was "at our property assisting his mother with cleaning of her apartment due to a

flood," and that "[t]his incident took place on Wednesday, October 6, 2004 and October 8,

2004."  (Pl's Opp'n Mot. Ex. 5.)  Mr. Brown claims that he had never told Mr. Manvilla, or

anyone at Unilever, that he was going to meet an insurance adjuster at his mother's house on the

8th.  Regardless, Mr. Manvilla requested additional documentation from Village Oaks about the

presence of an insurance adjuster, and Mr. Brown also was asked to provide documentation for

the absence on October 22nd.  The deadline given was November 2nd.

When no additional information was produced by the 2nd, Mr. Brown was suspended

from work.  The parties met again on November 9th, at which point Mr. Brown produced the

letter from Pam Del Nero at Key Point.  That letter states, in its entirety, "Per Mr. Brown's

request, this letter is to confirm that he had an appointment for his mother on Friday, October

22nd but he had to cancel it.  It was rescheduled for Friday, November 5, 2004 at 10:30am."

(Def's Mot. Summ. J. Ex. N.)  Mr. Brown explained to his employers at this meeting that the documentation "took as long as it did because of the HIPPA [sic] laws and the waiver rights . . . that's why [Manvilla] didn't get it until the 9th." (Def's Mot. Summ. J. Ex. A at 125-26.)  At this meeting, Unilever requested that Mr. Brown submit a copy of his phone bill, utilities bills, and a copy of his deed - apparently to confirm what Brown had said earlier about where he was residing on the 22nd of October.   Mr. Brown provided these documents on November 23rd and was asked to provide similar documentation from his mother.   He provided that information to Ellis Staten, a union leader.

Mr. Brown's employment was terminated on December 3 for gross insubordination in refusing to provide documentation related to his FMLA absences.  He grieved his termination, but the grievance was denied.  The Union chose not to pursue arbitration, apparently agreeing that Mr. Brown had improperly refused to provide documentation to support his requests for FMLA leave.  (Def's Mot. Summ. J. Ex. P.)

Mr. Brown filed this lawsuit in October of 2006.  He alleges that Unilever "willfuly violated §2615 of [the FMLA] when it failed to provide Plaintiff with FMLA leave. . . restrained and denied the exercise of Plaintiff's FMLA rights, and otherwise violated Plaintiff's rights." (Compl. at ¶23.)  He additionally claims that Unilever "unlawfully discharged Plaintiff for exercising his rights under the Act."  (Compl. at ¶24.)  Unilever has moved for summary judgment on all claims, arguing that it was justified in firing Mr. Brown because it had a reasonable belief that he had committed fraud, and because Mr. Brown failed to comply with Unilever's requests for documentation for his FMLA leave.

<u>*ANALYSIS*</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the

motion:

> By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.' " *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The

court must "view the evidence in the light most favorable to ... the nonmovant, and draw all

reasonable inferences in her favor without weighing the evidence or assessing the witness'

credibility," *Dennis v. Columbia Colleton Med. Ctr.*, Inc., 290 F.3d 639, 644-45 (4th Cir.2002),

but the court also must abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir.1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

The Family and Medical Leave Act (FMLA) is designed "to balance the demands of the

workplace with the needs of families." 29 U.S.C. § 2601(b)(1) (2005).  In pursuit of this goal,

the law "entitle[s] employees to take reasonable leave . . . for the care of a child, spouse or parent

who has a serious health condition."  *Id.* at § 2601(b)(2).  Qualified employees are entitled to a

total of twelve workweeks of leave during any 12-month period; such leave may be taken

intermittently when medically necessary.  *Id.* at § 2612.  When the necessity for leave is

foreseeable, the employee must provide such notice as is practicable. *Id.* at § 2612(e)(2)(B).

        Moreover, an employer may require that a request for leave be supported by "a

certification issued by the health care provider of the eligible employee or of the son, daughter,

spouse, or parent of the employee, as appropriate."  *Id.* at § 2613(a).   The certification for

intermittent leave will be deemed sufficient if it states the dates on which the treatment was

given, a statement of the medical necessity for the leave, and the expected duration of the leave.

*Id.* at § 2613(b).  When certification has been requested, the employee must produce the required

documentation within the time frame stated by the employer (not shorter than fifteen days)

unless it is "not practicable under the particular circumstances to do so despite the employee's

diligent, good faith efforts."  29 C.F.R. § 825.305(d).  The employer may request certification at

some date after the employee has taken the leave, if it has reason to question the appropriateness

or duration of the leave.  *Id.* at § 825.305(c).  When the employer does request certification,

however, it must make clear to the employee the consequences of a failure to provide the

requested documentation.  *Id.* at § 825.305(d).  Should the employer find the documentation to

be incomplete, it must advise the employee of that fact and give the employee a reasonable

opportunity to cure any alleged deficiency. *Id.*

        The FMLA creates two types of claims.  The first includes interference claims, which are

based on alleged attempts by an employer to "interfere with, restrain, or deny the exercise of or

the attempt to exercise" any right protected by the act, 29 U.S.C. § 2615(a)(1); interference

claims encompass violations of the right to be reinstated to a similar position after taking leave.

The second is based on retaliation; these claims result from an employer's allegedly

"discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any

practice made unlawful by" FMLA, *Id.* at § 2615(a)(2).   Here, Mr. Brown clearly claims an

interference violation; the complaint alleges that Unilever "interfered, restrained and denied the

exercise of Plaintiff's FMLA rights."  (Compl. at ¶ 23.) It appears that Mr. Brown brings a

retaliation claim as well; the complaint further alleges that Unilever "unlawfully discharged

Plaintiff for exercising his rights under [FMLA]."[2] (Compl. at ¶ 24.) Each of these allegations

will be addressed in turn.


*Interference*

Mr. Brown first alleges that Unilever interfered with his rights under FMLA by allowing

him fewer than fifteen days to provide certification for his absences.  An employee must produce

the requested certification within the employer's timeframe, "unless it is not practicable under

the particular circumstances to do so despite the employee's diligent, good faith efforts."  29

C.F.R. § 825.305(b).

---

[2]Mr. Brown's complaint contains only one count, entitled "Action under FMLA."  Both
the interference and the retaliation claims are contained within.  This court will assume that Mr.
Brown seeks to bring both the interference and retaliation claims; his mention of both phrases,
though they were not separated into two counts, was sufficient to put Unilever on notice of Mr.
Brown's allegations (as evidenced by Unilever's inclusion of the possible retaliation claim in its
motion for summary judgment).

Here, Mr. Manvilla made his initial demand for documentation regarding Mr. Brown's absences on October 6th and 8th on October 11, 2004.  The deadline given at that meeting was October 18 - undoubtedly, a timeline of fewer than fifteen days.  Similarly, when asked on October 25th for documentation regarding his absence on the 22nd, Mr. Brown was given a deadline of only four days.  It is undisputed, however, that Mr. Brown's ultimate termination did not occur until December 3rd - more than six weeks after the initial demand for certification was made, and seven weeks after the meeting regard the second absences.  "To prevail under the cause of action set out in § 2617, an employee must prove, as a threshold matter, that the employer violated  § 2615 by interfering with . . . his or her exercise of FMLA rights.  Even then,  § 2617 provides no relief unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *see also Reed v. Buckeye Fire Equip. Co.*, 422 F. Supp. 2d 570, 576-77 (W.D.N.C. 2006).  That fifteen day limit imposed by the federal regulations is intended to give plaintiffs enough time to substantiate absences and protect their rights under the statute.  Where, as here, the employee is given ample opportunity to provide the appropriate certification before the ultimate termination decision is made, no claim for interference will lie.

Mr. Brown also argues that Unilever interfered with his rights under FMLA by not affording him a reasonable opportunity to cure any deficiencies in the certifications he did provide.  This argument, too, fails.  It is true that "termination is not an appropriate response for [sic] an inadequate certification;" rather, the employer "must give the employee a reasonable opportunity to cure any deficiencies." *Marrero v. Camden County Board of Supervisors*, 164 F. Supp. 2d 455, 466 (D.N.J. 2001).  Unilever did, however, provide ample opportunities to Mr.

Brown: first to provide the necessary certification, then to amend that certification when it was deemed inadequate. *See Novak v. Metrohealth Med. Ctr.*, __ F.3d __ , 2007 WL 2807004, at *5 (6th Cir. Sept. 28, 2007) (holding that employer satisfied duties under FMLA by informing plaintiff that her certification was deficient and permitting her to submit several additional forms); *cf. Sims v. Alameda-Contra Costa Transit Dist.*, 2 F. Supp. 2d 1253, 1266 (N.D. Cal. 1998) (holding that certification that did not address two days of employee's absences could not be used as grounds for discipline against him because the employer never notified the employee that certification was inadequate in any way).

It is undisputed from the record that at the meeting where Mr. Brown provided the note from the Village Oaks apartment, Mr. Manvilla told Mr. Brown that the letter from Tyra Gillard was insufficient, (Def's Mot. Summ. J. Ex. A at 121), and that Brown needed to provide something from the insurance adjuster. Mr. Brown claims that he never told anyone at Unilever that it was insurance adjusters and not apartment complex employees who necessitated Mrs. Whiting's absence on October 8th; even assuming this is true, by Mr. Brown's own admission he isn't sure whether or not he followed up with additional documentation. Mr. Brown later says that he "wasn't able to get any additional documentation." (Def's Mot. Summ. J. Ex. A at 123.)

Regardless, Mr. Brown admits that at that meeting, he was given until November 2nd to provide additional documentation. (Def's Mot. Summ. J. Ex. A at 122.)

At the meeting on November 9th, Mr. Brown produced the note from Pam Del Nero, his mother's therapist. The note only states that Mr. Brown's mother had an appointment on the 22nd, which was cancelled. On November 18th, Mr. Brown was informed that the note from Del Nero was inadequate and that he needed to provide additional information regarding his

whereabouts on October 22nd.

Mr. Brown argues that it was not "practicable under the particular circumstances" to provide substantiation for his three absences,[3] and that this question should be submitted to a jury. What Mr. Brown overlooks, however, is that he was not fired because his certification was untimely; he was fired because it was incomplete. The mere production of some documentation does not suffice to defeat a termination action if that documentation does not meet the employer's specifications, so long as those requirements are not more onerous than allowed by FMLA. An employer may deny FMLA leave even where an employee ultimately presents the employer with proper (though late) certification. *Washington v. Fort James Operating Co.*, 110 F. Supp. 2d 1325, 1331-32 (D. Or. 2000).

Further, Mr. Brown was fired because Unilever had discovered, through use of a private investigator, that his representations to the company regarding his activities on October 22nd were not accurate. The report issued by Unilever's private investigator advised that Mr. Brown did not visit his residence on October 22nd and that his mother did not leave her apartment on that day – directly contradicting Mr. Brown's statement that he spent at least part of the day with Mrs. Whiting. Whether Mr. Brown was actually residing at the apartment or the house that day is not dispositive; what matters is that Unilever believed its employee was fraudulently taking

---

[3] For October 6th and 8th, because he "had to wait to get the documentation" from the main apartment management office, (Def's Mot. Summ. J. Ex. A at 94), and for October 22nd, "because of the HIPPA [sic] laws and the waiver rights and Pam would not write it until I got in there, got my mom to sign the HIPPA waiver," (Def's Mot. Summ. J. Ex. A at 125). Mr. Brown does not cite any attempts he made to inform his employer before the deadlines had passed that his certification was going to be late; he did not say anything to Mr. Manvilla until October 21st, three days after the deadline for the first absences. In determining whether or not it was practicable under the circumstances to submit timely certification, an employee must at least "contact his employer by telephone and make it aware that he is unable to return his certification before the deadline." *Peter v. Lincoln Tech. Institute*, 255 F. Supp. 2d 417, 441 (E.D. Pa. 2002).

FMLA leave.  Because that belief was reasonable, the termination was justified. *See Medley v.*

*Polk Co.*, 260 F.3d 1202, 1207-08 (10th Cir. 2001), *Kariotis v. Navistar Int'l Trans. Corp.*, 131

F.3d 672, 680-81 (7th Cir. 1997)*, Williamson v. Parker Hannifin Corp.*, 208 F. Supp. 2d 1248

(N.D. Ala. 2002).

     *Retaliation*

     In order to bring a claim for wrongful termination under FMLA, Mr. Brown must first

establish a prima facie case of discrimination or retaliation.  *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 141 (2000); *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502

(4th Cir. 2001).  He must show that he availed himself of a protected right under the FMLA; that

he was adversely affected by an employment decision; and that there is a causal connection

between his protected activity and the adverse employment action. In order to rebut the

presumption that arises from the prima facie case, Unilever has the burden to produce evidence

that would permit a rational factfinder to conclude that the employment action was taken for a

"legitimate, nondiscriminatory reason."  *Reeves*, 530 U.S. at 141 (quoting *Texas Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248 (1981)).  The defendant's burden is one of production, and the

court should not evaluate the credibility of the defendant's explanation.  *See id.* Once such a

reason is offered, the burden returns to Mr. Brown to demonstrate a trial-worthy issue of pretext

- that is, that the legitimate reasons offered by the defendant were not its true reasons.  *Burdine,*

450 U.S. at 256.

     Mr. Brown and Unilever disagree as to whether a prima facie case of retaliation has been

established; Unilever claims that Mr. Brown has not established any causal connection between

the use of FMLA leave for its intended purpose and his termination.  For the purpose of this

summary judgment motion, the court will assume without deciding that a prima facie case has been established.  Here, however, Unilever has offered legitimate, nondiscriminatory reasons for Mr. Brown's termination - the failure to produce requested documents, and the company's reasonable belief that he was fraudulently using FMLA leave - which Mr. Brown has failed to rebut.

Unilever asserts that Mr. Brown was fired for "gross insubordination," including "withholding of necessary information" and "refusal to obey directives."  (Def's Mot. Summ. J. Ex. O.)  Additionally, Unilever cites Mr. Brown's "contradictory statements" made in the course of his "attempt to justify the absences."  (*Id.*)  A reasonable suspicion that Mr. Brown was not using his FMLA leave for its intended purpose - that is, the purpose of caring for his mother - and thus "falsifying Company records" would be a sufficiently legitimate reason for termination.

Mr. Brown must show not only that this explanation was false, but that discrimination was the true motivation behind his termination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993).  He may do that either by showing that Unilever's stated reasons are not credible, or by showing that the action was more likely motivated by discriminatory animus.  *Burdine*, 450 U.S. at 256.  Mr. Brown claims that Unilever's stated reasons were pretextual: he appears to allege that he was fired owing to his strained relationship with Mr. Manvilla, which was due to his position as a union leader.  (Pl's Supp. Opp'n Mot. at 9.)  Mr. Brown offers no evidence in support of this allegation.  Similarly, Mr. Brown offers no evidence in support of his claim that he was targeted for termination because he was one of only two Baltimore Foods Factory employees utilizing FMLA leave.  (Def's Mot. Summ. J. Ex. A at 113-14.)  In fact, Unilever had

14

at least twelve employees who were utilizing FMLA leave, intermittent or otherwise, while

Keith Brown was employed there.  (Def's Mot. Summ. J. Ex. L.)

   In the context of his retaliation claim, it does not matter that Unilever may have been

mistaken about whether Mr. Brown's mother was at her house on October 22nd.  What matters is

that Unilever honestly believed she was, and believed Mr. Brown had fraudulently claimed the

day as FMLA leave when in fact it was not being used for that purpose.  *See Price v. Thompson*,

380 F.3d 209, 214 n.1 (4th Cir. 2004) (noting that "mere mistakes of fact are not evidence of

unlawful discrimination.").


## CONCLUSION

   For the foregoing reasons, defendant Unilever's  motion for summary judgment will be

granted.   A separate Order follows.



   October 24, 2007                                    /s/
         Date                              Catherine C. Blake
                                           United States District Judge

15